**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ROBERT CHARLES JACKSON,** | ) | |
| **ID # 1686823,** | ) | |
| **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:13-CV-2982-L (BH)** |
| | ) | |
| **WILLIAM STEPHENS, Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order 3-251*, this habeas case has been automatically referred for findings, conclusions, and recommendation. Based on the relevant filings and applicable law, the petition should be denied.

## I. BACKGROUND

Robert Charles Jackson (Petitioner), an inmate currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ-CID), filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. The respondent is William Stephens, Director of TDCJ-CID.

### A.   <u>Factual Background</u>

At Petitioner's trial for family-violence aggravated assault, the victim testified that she had been in a dating relationship with him for about a year and had lived with him for about three months. (3 Reporter's Record "RR" 16-17.) When the relationship ended, they continued to communicate; Petitioner wanted to get back together, but she did not. (3 RR 17-18.) On June 5, 2009, she returned to her apartment and found her window broken. (3 RR 19-20.) Petitioner came up and said some kids throwing rocks had broken her window. (3 RR 20-21.) The victim was

surprised to see Petitioner and noticed that the rock was sitting outside of her apartment instead of inside.  (3 RR 21-23.)  She went inside, called maintenance to fix the window, and eventually went to bed.  (3 RR 23-25.) She awoke at midnight and went outside to check on the window, which was covered with cardboard. While she was outside, Petitioner approached her again. (3 RR 26-28.) They began arguing, and when she turned to go back into her apartment, he followed her in.  (3 RR 28-29.) For the next two hours, Petitioner assaulted her.  (3 RR 41.) He punched her ten to fifteen times, swore at her, picked her up by her night shirt, yelled in her face, ran water in the bathtub, and threatened to drown her in her own tub.  (3 RR 30-32, 35-36.) The victim testified that Petitioner punched her like a boxer, from a boxing stance, and that he had been an award-winning boxer when he was younger.  (3 RR 33-35.) One punch to her left eye caused her vision to become filmy. (3 RR 29-30, 32.) She begged him not to kill her and said she needed to go to the hospital. (3 RR 37.) He stood in her way and told her she was not leaving the apartment. (3 RR 38.) Eventually, he let her into the kitchen to get a towel, pressed himself up against her, said he loved her and was sorry, and asked her to stop crying. (3 RR 38-39.)  He pulled a knife from the kitchen drawer and told her to just kill him because he felt so bad. (3 RR 39.)  He kissed her, let her dress, and said he would take her to the hospital.  (3 RR 39-40.) He told her they were going to say that she hurt herself falling down. (3 RR 41.) On the drive to the hospital, Petitioner unlatched her seat belt and said he was going to push her out, but he never did. (3 RR 42.)

When they arrived at the hospital, Petitioner told her to remember what he had said and then helped her out of the car. (3 RR 43.) On the sign-in sheet for emergency services, the victim wrote, "Help me he beat me!!" (3 RR 43; 5 RR 27[1] (SX 4).) Hospital staff took her to a back room while

---

[1]The state trial exhibits ("SX") are in volume 5 of the Reporter's Record.  (See doc. 19-5 at 27.) Citations refer to the CM/ECF system page number at the top of each page, as the trial exhibit pages are not otherwise numbered.

Petitioner stayed in the waiting area.  (3 RR 44.)  Immediately, Petitioner called the victim on her cell phone, and she put it on speaker so that the attending nurse could hear the conversation. Petitioner asked what they were doing and whether she was okay. (3 RR 44-46; 5 RR 22 (SX 4).)

The victim testified that she was diagnosed with a corneal abrasion and nerve damage to her face, which caused stuttering. (3 RR 56-57.) The emergency room records indicate that she was diagnosed with a corneal abrasion and facial contusion. (5 RR 31 (SX 4).)  Records from Cornea Associates of Texas dated between March and November of 2010 show that she was subsequently treated for an infection and a corneal scar that resulted from the injury. (5 RR 44, 52 (SX 5).) The State also introduced testimony from the victim's sister and uncle, who met the victim at her apartment after her release from the hospital. (3 RR 109-25.) They testified that the victim was beat up, her apartment was in disarray, her bathtub was full of water, and there was a knife on the kitchen counter. (3 RR 117-19, 123-24.) They confirmed that the victim did not stutter or have vision problems before June 5, 2009. (3 RR 119-20, 124.)

The defense presented testimony from the manager of the Steak & Shake, where Petitioner worked.  He said that the victim had convinced him to hire Petitioner, but he now had a poor opinion of her truthfulness.  (3 RR 133.) He explained that Petitioner did a great job at Steak & Shake, but the victim started lying, saying she believed Petitioner was on heroin and was planning to rob the restaurant. (3 RR 134-35.) The manager talked to Petitioner about "the Word," and Petitioner shared his body-building work-out tips. (3 RR 135-137.) The manager clarified that he had believed the victim was a truthful person until she accused him of trying to "hit on" her. (3 RR 137.)

Petitioner testified that he had been cheating on the victim with two of his co-workers, and that the victim had an inferiority complex and was jealous. (3 RR 148-52.)  He was working at Steak

3

& Shake on the night of June 5, 2009, when the victim called him at about 9:30 p.m. (3 RR 153-54.) The victim told him that she had just fought with one of the two co-workers he was seeing and had taken half a bottle of his "blue dolphins," pills he described as "kind of like acid" but taken "for euphoric sexual experiences." (3 RR 154, 165.) Petitioner testified that the manager gave him a ride from work so that he could take the victim to the hospital. (3 RR 155.) Petitioner said he found the victim at her apartment, "wired up," and "swinging and fighting." (3 RR 154, 167.) She was "out of there," and he did not have time to wait. (3 RR 155, 171.) He picked her up, forced her into the van, drove to the hospital, carried her into the emergency room, and told the staff that she may have overdosed. (3 RR 155-57.) He was in the waiting room when the police came and arrested him for beating her up. (3 RR 155-57.)  He said he did not hit the victim.  Because he had 26-inch biceps and could bench-press almost 400 pounds, she would have been "messed up" if he had hit her. (3 RR 157.) When asked to explain the victim's vision loss and stuttering during her testimony, Petitioner said he never saw any of that, and it could have happened "anytime after" he had been around her. (3 RR 167-68.) He agreed that the victim looked like she had been in an altercation in the pictures taken at the hospital, but he said that she did not look like that when he saw her.  She only had "some scratches and stuff." (5 RR 5-9 (SX 1-3); 3 RR 155-56, 165-66.)

The jury convicted Petitioner of aggravated assault by striking the victim with his hand, a deadly weapon, and causing serious bodily injury. (Clerk's Record "CR" 31, 36, 50); *State v. Jackson*, No. F10-56143-T (283rd Jud. Dist. Ct., Dallas Co., Tex. Dec. 9, 2010).)  At sentencing, the State introduced documents showing that Petitioner had been previously convicted of several felonies:  theft in 2006 (SX 8, 13), burglary of a habitation in 1989 (SX 6), burglary of a habitation in 1990 (SX 7), theft in 1992 (SX 9), and theft in 2007 (SX 11). The State also presented evidence

that Petitioner had been convicted of family violence misdemeanor assault in 2005 (SX 10) and violating a protective order in 2010 (SX 12). The 2005 family violence assault named another woman as the complainant, but the 2010 protective order case named the victim.  (4 RR 24, 27.) The jury found that Petitioner had been previously convicted of two felonies and sentenced him as an habitual offender to forty-years' confinement.  (CR 46, 49).

**B.**    **Procedural History**

Petitioner appealed his conviction, and the Court of Appeals for the Fifth District of Texas affirmed in an unpublished opinion. *Jackson v. State*, No. 05-10-1601-CR, 2012 Tex. App. LEXIS 2322, 2012 WL 998724 (Tex. App.–Dallas 2012, pet. ref'd). The Texas Court of Criminal Appeals ("CCA") denied his petition for discretionary review.

Petitioner filed a *pro se* application for writ of habeas corpus raising five grounds for relief. (5 State Habeas Record "SHR" 3-62.)[2]  The CCA denied the application without a written order on May 29, 2013. *See Ex parte Jackson*, WR-79,342-01 (Tex. Crim. App. May 29, 2013); (5 SHR at cover). Petitioner filed a federal petition and supporting memorandum raising the same five grounds for relief. (*See* docs. 3,4.) Respondent filed an answer and provided the state court records. (*See* doc. 18.) Petitioner filed a reply (*see* doc. 20), and subsequently moved for a stay and abeyance so he could challenge in state court one of the convictions used for the enhancement of his punishment. (*See* doc. 21.) The stay was denied. (*See* docs. 22, 24.)  Petitioner then filed a motion for leave to amend the § 2254 petition, with a proposed amended petition that added another claim of ineffective assistance of counsel. (See doc. 27.)  Respondent filed a response and objection to the motion for leave to amend, and Petitioner filed a reply. (*See* docs. 33, 36.)

---

[2]The state habeas record volumes are not numbered and are cited by docket number.  (*See* docs. 13, 14, 15).

C.     **Substantive Issues**

Petitioner claims the State is holding him unlawfully because (1) the evidence is insufficient to support the allegations of serious bodily injury and use of a deadly weapon, (2) the prosecutor engaged in prosecutorial vindictiveness by prosecuting the case as a felony only after a jury found him guilty of a lesser-included offense in a related 2010 protective order case, (3) trial counsel provided ineffective assistance, (4) the prosecution suppressed exculpatory evidence, and (5) appellate counsel provided ineffective assistance.  (docs. 3, 4.)  In his amended petition, he also contends that trial counsel was ineffective for failing to investigate and object at punishment to the use of an invalid prior conviction to enhance his sentence.  (*See* doc. 27.)

## II.  AEDPA STANDARD

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions.  Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established fed-

eral law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III. SUFFICIENCY OF THE EVIDENCE (GROUND 1)

In his first ground for relief, Petitioner contends the evidence is legally insufficient to support

the jury's finding of serious bodily injury and use of a deadly weapon. The state court rejected this

claim on direct appeal. *Jackson*, 2012 WL 998724, *4.

On federal habeas corpus review, the evidentiary sufficiency of a state court conviction is

governed by the legal-sufficiency analysis set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979),

which reflects the federal constitutional due process standard. *See Woods v. Cockrell*, 307 F.3d 353,

358 (5th Cir. 2002). To be sufficient, "[t]he evidence need not exclude every reasonable hypothesis

of innocence or be completely inconsistent with every conclusion except guilt, so long as a

reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."

*United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012). Under *Jackson*, a reviewing court

determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson*, 443 U.S. at 319. The evidence must be viewed "in the light most favorable to the

verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which

tend to support the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)

(quoting *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997)); *see also Weeks v. Scott*, 55

F.3d 1059, 1061 (5th Cir. 1995) (a federal court may not substitute its view of the evidence for that

of the fact finder, but must consider all of the evidence in the light most favorable to the verdict).

Petitioner was charged with the first-degree felony of family-violence aggravated assault,

which required the State to prove that he both caused serious bodily injury and used a deadly

weapon during the commission of the assault. (CR 4); Tex. Penal Code Ann. § 22.02(b)(1) (West

2005). The indictment alleged that Petitioner caused serious bodily injury to the victim by striking

her with a hand or hands. (CR 4.) The statute defines serious bodily injury as "bodily injury that

8

creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any body member or organ." *See* Tex. Penal Code Ann. § 1.07(46) (West 1995). Bodily injury means "physical pain, illness, or any impairment of physical condition." § 1.07(8). Petitioner contends the evidence is insufficient to show he caused nerve damage, noting that the emergency room records do not contain that diagnosis. He also argues that the victim's left eye was not seriously injured because those records show exceptional 20/10 vision in that eye.

The records from the victim's emergency room visit do not contain a diagnosis of "nerve damage", but do note the following from an apparent eye examination administered at 4:25 a.m.: "R 20/30", "L 20/10", and "B 20/40." (5 RR 20 (SX 4); 3 RR 73-74). The records from Cornea Associates of Texas, where the victim sought medical care about nine months after the assault (in March of 2010), indicate that her cornea subsequently became infected and scarred, that her vision had decreased since the June 2009 injury, that she is sensitive to light, and that she has "a chronic condition that requires persistent medication and has resulted in blurred vision." (5 RR 44, 47, 52 (SX 5)). A "letter of medical necessity" dated one month before the trial states that with spectacle correction, the victim "only achieves 20/70 vision for the left eye, but with a specialty [contact] lens she is able to read 20/30, a remarkable improvement." (5 RR 49 (SX 5)). The victim testified she was being treated twice a month at Cornea Associates, she was told that there is no guarantee her eye will recover, and she may eventually need a transplant. (3 RR 64-65). This evidence is sufficient for any rational fact finder to conclude that the victim suffered the "protracted loss or impairment of the function of" her left eye. *See* § 1.07(46). Viewed in the light most favorable to the verdict, the difference in the victim's vision between the examination conducted at the hospital

and the examination at Cornea Associates may be explained by the subsequent infection and scarring.  Any credibility choices and conflicting inferences are resolved in favor of the jury's verdict and do not render the evidence legally insufficient. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (stating that in a legal sufficiency review, all credibility choices and conflicting inferences are to be resolved in favor of the verdict).

Petitioner next contends the State never verified that he was a boxer, apparently inferring that the evidence is insufficient show his hands were deadly weapons. A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." § 1.07(17). A hand or fist is not a deadly weapon per se, but may become a deadly weapon if used in a manner capable of causing death or serious bodily injury. *See Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (citing *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983)).

Here the damage to the victim's eye is sufficient for an inference that Petitioner used a deadly weapon capable of causing serious bodily injury. *See Tucker v. State*, 274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008); *see also Lane*, 151 S.W.3d at 191. In addition, the victim testified that Petitioner was an "award-winning" boxer when he was younger, and that he had punched her from a boxing stance. (3 RR 33-34.) The victim and Petitioner knew each other while growing up because their mothers had been close friends, Petitioner had gone to school with the victim's older sister, and the families were very close and often ate Sunday dinners together. (3 RR 16, 110-11, 144.) Although Petitioner denied that he was ever a boxer, (3 RR 166), conflicts are the jury's bailiwick and are resolved in favor of the verdict in a legal sufficiency review.  Regardless of whether Petitioner was ever a boxer, there was other evidence supporting the finding that his hands were capable of causing serious bodily injury.  The manager testified that Petitioner was a body-

builder. (3 RR 135.) Petitioner testified he had 26-inch arms and could bench press almost 400 pounds, and that the victim "would be messed up" if he had hit her.  (3 RR 157.)  He reiterated, "If I take this shirt off–I'm a pretty big dude.  If I hit that little woman, you ain't going to see what you saw back there.  I hit men." (3 RR 160.) He confirmed on cross-examination that she would be messed up "bad. . . . It would have been some blood and everything. I have hit men and done some damage. That's a soft little woman." (3 RR 160.)

Viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that Petitioner used his hands in a manner capable of causing serious bodily injury, and that he caused serious bodily injury to the victim's eye.  He has failed to demonstrate that the CCA unreasonably applied the *Jackson* sufficiency standard and is therefore barred from re-litigating the legal insufficiency claim.  It should be denied.

### III.  PROSECUTORIAL VINDICTIVENESS (GROUND 2)

In ground two, Petitioner asserts that this case was originally filed as a misdemeanor assault under cause number MA09-57598 and dropped for lack of evidence, and that the prosecutor refiled it as a felony aggravated assault after a jury convicted him of a lesser-included offense in the 2010 protective order case.  (doc. 4 at 11.)[3] He asserts that this prosecutorial vindictiveness punished him for standing on his legal rights and violated due process.  The state court denied this claim.

The rule against prosecutorial vindictiveness is grounded in the "most basic" due process right not to be punished for what the law plainly allows a defendant to do. *See United States v. Goodwin,* 457 U.S. 368, 372 (1982). The Supreme Court has held that due process is offended by the possibility of increased punishment after a successful appeal where it poses "a realistic

_____

[3]Citations refer to the CM/ECF system page number at the top of each page.

likelihood of vindictiveness" on the part of a prosecutor. *Blackledge v. Perry*, 417 U.S. 21, 27-28 (1974) (holding that after appeal from a misdemeanor conviction entitling the defendant to a trial de novo, the state denies due process by bringing a felony charge against him for the same conduct, unless the state shows that it was impossible to proceed on the felony charge at the outset). The Court explained that it is "not constitutionally permissible for the State to respond to [a criminal defendant's] invocation of his statutory right to appeal by bringing a more serious charge against him" on retrial. *See id.* at 28-29.

To prove prosecutorial vindictiveness, a defendant may (1) show actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights, or (2) show sufficient facts to create a presumption of vindictiveness. *United States v. Saltzman*, 537 F.3d 353, 359 (5th Cir. 2008). A court must examine the prosecutor's actions in the context of the entire proceedings. *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir. 1983). "If any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of the charges was motivated by some purpose other than a vindictive desire to deter or punish appeals, no presumption of vindictiveness is created." *Id.*  On the other hand, if "the course of events provides no objective indication that would allay a reasonable apprehension by the defendant that the more serious charge was vindictive, i.e., inspired by a determination to 'punish a pesky defendant for exercising his legal rights,' a presumption of vindictiveness applies." *Id.* This presumption "cannot be overcome unless the government proves by a preponderance of the evidence that events occurring since the time of the original charge decision altered that initial exercise of the prosecutor's discretion." *Id.*

Here, Petitioner proffers a Dallas County computer printout showing his record of release from county custody. (5 SHR 58.) It shows that after his arrest on June 5, 2009, he was released on June 11. The computer printout is not a court document but appears to be a jail-generated list of all the times Petitioner has been released from custody. Unidentified handwritten notes on the exhibit state "M-0957598," "Misd.Assault," and "dismissed 6-11-09," but the record itself contains no cause number or identifying charge connected to the release. The name of the person identified as authorizing the release is not the trial prosecutor or the district attorney. Under a column labeled "Reasons for Release," it states, "Finding of Facts Release," not "lack of evidence" or "charge dismissed." There is no explanation in the record as to what "Findings of Facts Release" means and whether it relates to the assault or the protective order proceeding.

On June 6, the day after the June 5 assault and before Petitioner's June 11 release, a magistrate issued the victim an order for emergency protection. (3 RR 90-91; 5 RR 107-08); *see* Tex. Code Crim. Proc. Ann. art. 17.292 (West 2007). Despite the protective order, on June 14, Petitioner entered the victim's apartment through the broken window and held her up against the wall. (3 RR 89-90.) He was arrested for violating the protective order by assault. (3 RR 90; 4 RR 74; 5 RR 108.) He then remained in custody until his trial on that charge in May 2010. (4 RR 74; CR 8.) Although he had been charged with felony violation of a protective order by assault, the jury convicted him of misdemeanor violation of a protective order. (5 RR 102); *see* Tex. Penal Code Ann. § 25.07(g) (West 2007). The judge suspended his sentence and placed him on probation. (4 RR 38-39; 5 RR 101-06 (SX 12).) A day later, a magistrate judge found probable cause to arrest Petitioner for the original June 5, 2009 assault, and he was re-arrested before he could be released to serve probation on the protective order case. (CR 6-7; 4 RR 74-75.) The same attorney

represented Petitioner in the protective order case and in the aggravated assault case, and both cases were tried before the same judge. (2 RR 10; 5 RR 102) (SX 12).)

Petitioner testified before the jury in the aggravated assault case that although the victim had claimed she was responsible for his release on June 11, he was let out for "lack of evidence." (3 RR 157-59.) The prosecutor asked him why he believed that this case had been dropped. Petitioner said that he looked it up on the computer and the "same case" was written as a misdemeanor and "dropped" for lack of evidence. He further believed the prosecutor had enhanced the charge to a felony following the misdemeanor verdict in the protective order case. (3 RR 169-70.) The prosecutor took issue with Petitioner's premise, stating, "Let's just clarify something. . . . It's not correct to say you were let out of jail on this case because of lack of evidence." (3 RR168-70.)  At the punishment phase, Petitioner elaborated that he was about to be released from jail to begin serving probation: "I didn't get to touch my clothes and they came and hit me with this charge that she picked up as a misdemeanor that turned into aggravated assault with a deadly weapon. She was digging to get me." (4 RR 75.) During jury argument, defense counsel stated that Petitioner and the prosecutor "have a personal grudge," and that Petitioner "probably thinks it was just dirty pool, coming back and filing this case after receiving probation.  I don't know. Maybe it was; maybe it wasn't." (4 RR 82-83.)

Petitioner identifies no evidence of actual vindictiveness in the record, i.e., objective evidence that the prosecutor acted in order to punish him for standing on his legal rights.  Nor has he shown that the facts are sufficient to create a presumption of vindictiveness.  The cases upon which Petitioner relies all involve changes in the charging decision for *the same conduct*.  Here, the conduct underlying the June 9 aggravated assault case is distinct from that underlying the June 14

protective order violation; both are separate offenses supported by independent probable cause. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). The verdict in the protective order case did not create the opportunity to bring the felony charge; the prosecutor could have proceeded on the aggravated assault charge regardless of the outcome of the earlier trial. *See Williams v. Bartlow*, 481 F.3d 492, 501, 504 (7th Cir. 2007) (upholding state court ruling that *Blackledge* presumption does not apply to the bringing of new charges based on different conduct); *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986) (stating that presumption does not arise if second charge arises out of different nucleus of operative facts as the original charge); *United States v. Eason*, 434 F. Supp. 1217, 1220-21 (W.D. La. 1977).

In addition, the presumption of vindictiveness does not apply in the pretrial setting for three reasons. *See Goodwin,* 457 U.S. at 381-84 (refusing to adopt presumption of vindictiveness where prosecutor indicted defendant on felony after he declined to plead guilty and requested jury trial on misdemeanor charge). First, the prosecutor's assessment of the evidence may be in flux prior to trial; second, the defendant's invocation of procedural rights before trial may inevitably impose some "burden" on the prosecutor, but it is an integral part of the adversary process and it is unrealistic to presume that the prosecutor's probable response to such motions is to seek to penalize and deter; and third, a prosecutor should remain free before trial to exercise the broad discretion entrusted in him to determine the extent of the societal interest in prosecution. *Id.* These rationales are particularly applicable in this case, where the victim's serious bodily injury (which was necessary to charge the felony offense) manifested months after Petitioner's initial arrest and release,

and where his second offense against the same victim increased the societal interest in prosecution.

Finally, Petitioner does not show that he pursued some right for which the prosecutor's decision to file the felony charge may be seen as exacting retribution. Petitioner contends the jury trial followed by the misdemeanor verdict in the protective order case triggered the refiling of this case as a felony.  As noted, the invocation of a jury trial right is an integral part of the adversary process, and it is unrealistic to presume that a prosecutor's probable response to it is to penalize and deter. *See Goodwin,* 457 U.S. at 383 (distinguishing the "burden" imposed on the prosecution by a trial from the burden and institutional bias against *retrial* after appeal); *Bordenkircher*, 434 U.S. at 363  (holding that due process clause did not prohibit prosecutor from carrying out threat during plea negotiations to bring additional charge justified by the evidence if defendant insisted on going to trial).  For purposes of prosecutorial vindictiveness claims, courts do not recognize the outcome of jury deliberations to be the result of any exercise of a right on the defendant's part. *See United States v. Ruppel,* 724 F.2d 507, 508 (5th Cir. 1984) (rejecting claim of prosecutorial vindictiveness based on reindictment after jury failed to reach verdict) (citing *Goodwin* and *Bordenkircher*).

In conclusion, Petitioner has failed to show that state court misapplied the clearly established federal law of prosecutorial vindictiveness, and his second claim should be denied.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL (GROUND 3)

In claim three, Petitioner alleges that trial counsel was ineffective for (a) failing to subpoena medical records that would show the victim had a corneal scratch before the assault, (b) failing to subpoena the co-worker he was seeing to establish the victim's motive for filing a false complaint against Petitioner, and (c) failing to object when the trial judge did not allow him, during his trial testimony, to obtain the documents related to the misdemeanor case discussed in ground two. In a

related claim, he contends that as a *pro se* applicant for state habeas relief, he was denied ineffective assistance at the post-conviction stage under *Martinez v. Ryan*, 132 St. 1309 (2011).

The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. art. VI.   To successfully state a claim of ineffective assistance of counsel, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective.  *See* 466 U.S. at 696.  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors.  *Id.* at 695-96.

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689.   "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Id.* at 691.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694. Petitioners must "affirmatively prove prejudice."  *Id.* at 693.  They cannot satisfy the second prong with mere speculation and conjecture.  *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).

### A.    Evidence of pre-existing corneal scratch

Petitioner asserts that he asked his trial counsel to subpoena the "vision analysis" records

from Walmart Eye Center in Dallas to verify that the victim was diagnosed with corneal abrasion "way before" June 5. (doc. 4 at 14). He claims counsel said he would not subpoena the records because the jury would know the victim was a liar when they learned he had "won" the protective order trial, and because the emergency room records showed her vision to be 20/10.

The record contains no evidence to support Petitioner's claim that such medical records exist, and he does not explain with any degree of specificity why he believes they do. Even if there were vision records demonstrating that the victim suffered a corneal abrasion "way before" June 5, the victim's sister and uncle testified that she did not stutter or have problems with her vision before then. (3 RR 119-20, 124.) The emergency room records and photos from June 5 unequivocally showed that the victim had a visible corneal injury and facial contusion, evidenced by swelling. The victim wrote on the intake form, "Help me he beat me!!", and reported to emergency staff that her boyfriend had assaulted her within the last two hours. Petitioner called the victim's cell phone as soon as she was taken back for treatment and asked her what they were doing, which a jury could reasonably interpret as evidence of consciousness of guilt or fear of being caught. (5 RR 16, 18, 21-22, 31 (SX 4).) While the emergency room records did not indicate severely impaired vision on June 5th, subsequent records from the cornea specialist showed that after the infection and scarring, the victim's vision with spectacle correction was 20/70. (5 RR 49 (SX 5).)

At trial, Petitioner denied assaulting the victim, stating that she had fought with the co-worker, overdosed on his sexual enhancement pills, and did not appear injured to him. He said the victim called him at work at 9:30 p.m., and his manager drove him to the victim's apartment, where Petitioner put her in her van and drove thirty minutes to the hospital. He said he told hospital staff there was a possibility that the victim overdosed. (3 RR 157.) Based on this version of events,

18

Petitioner and the victim would have arrived at the hospital several hours before the 3 a.m. arrival time shown in the paperwork. (3 RR 50; 5 RR 21, 25 (SX 5).)  The hospital records show no report of a possible overdose. (3 RR 171.) Additionally, the manager was the leading witness for the defense. Although he described his friendship with Petitioner and his belief that the victim was a liar, he never mentioned driving him to her apartment or even being with Petitioner that night. (3 RR 137-38).  Petitioner also admitted hiding his lifestyle and drug use from his manager and trying to "keep the company [the manager] would admire." (3 RR 164-65).[4]

In light of the record, evidence of a prior corneal abrasion would not alter the evidentiary picture. *See Strickland*, 466 U.S. at 696. A reasonable probability requires a "substantial" not just a "conceivable," likelihood of a different outcome. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011)). Given the contemporaneous hospital records and photos documenting the recent injuries to the victim, the significant inconsistencies with Petitioner's version of events, and the lack of corroboration from his own witness, counsel's alleged failure does not create the substantial likelihood of a different trial result. Evidence of an eye injury "way before" June 5 would simply show that Petitioner re-injured an eye which, until then, had not suffered any serious vision loss.

The state court did not unreasonably reject Petitioner's claim, and it should be denied.

**B.**      **Failure to subpoena co-worker**

Petitioner next contends that counsel should have subpoenaed the co-worker he was seeing because she could have testified that he never assaulted the victim, that the victim found them in bed

---

[4] Petitioner admitted on cross-examination that he was dating four women at the time of the assault. (3 RR 161). When asked what he did on June 5th before going to work, he replied, "Well, you know, sit around, you know, pump a little iron, you know, smoke a little weed, drink a little bit and, you know, nothing just too serious, you know, just average alley cat type." (3 RR 153). He described his relationship with the co-worker as "just booty call." (3 RR 152).

together, and it "has been an up and down thing and how [the victim] plotted to get me convicted."

He states that counsel refused to subpoena his co-worker "due to her being a call girl who sat in the

lobby of my job to make her transactions."  (doc. 4 at 16).

The victim testified on cross-examination that she was not aware of Petitioner being involved

with another woman and did not confront him about that. (3 RR 67.)  Petitioner testified that he

moved in with his co-worker, a waitress who worked the window at Steak & Shake, and the victim

was not happy about it. (3 RR 149-51.) He said the co-worker knew their relationship was a

temporary "booty call" because he would most likely go back to the victim, given their history

together. (3 RR 152.)  Petitioner elaborated on the victim's complaints about his infidelity, stating,

"That's all she did. I mean it made me feel like I committed murder just to cheat. I had already been

doing it. For her to know about it, it's like she felt like I committed murder, man. She wasn't going

to let it rest." (3 RR 156.)

Complaints of uncalled witnesses are disfavored because the presentation of testimonial

evidence is a matter of trial strategy, and allegations of what a witness would have stated are largely

speculative.  *See Gregory v. Thaler*, 601 F.3d 347, 352-53 (5th Cir. 2010).  To prevail on this type

of claim, a Petitioner must name the witness, demonstrate that she was available to testify and would

have done so, set out the content of the proposed testimony, and show that the testimony would have

been favorable to a particular defense.  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Aside from his own conclusory assertions, Petitioner does not demonstrate that the co-worker was

available to testify or what her testimony would have been.

Even assuming that the co-worker could have corroborated Petitioner's testimony that the

victim fabricated the assault charge out of jealousy, this strategy would have simply pitted the

testimony of Petitioner and the object of his "booty call" against that of the victim, her sister and her uncle.  He argues that the co-worker's testimony corroborating his own testimony of his infidelity would have convinced the jury that the victim fabricated the charge out of jealousy.  The co-worker's alleged testimony would not establish a substantial likelihood of a different outcome because it would require the jury to believe that the assault never happened.  It would not account for all of the victim's injuries.  The state court could reasonably reject Petitioner's theory, with or without the co-worker's testimony, because is completely at odds with the injuries documented in the medical records.  This claim should be denied.

**D.** **Failure to obtain cause number of allegedly dismissed misdemeanor**

Petitioner appears to contend that his counsel should have objected during his cross-examination when the trial judge did not allow him to obtain a cause number from his folder to show that the prosecutor was using a medical report from the allegedly dismissed misdemeanor charge. (doc. 4 at 17).

Petitioner's allegation is not supported.  No exchange where Petitioner asked the judge if he could retrieve a cause number is apparent from the record.[5]  He identifies the cause number of the allegedly dismissed misdemeanor as MA09-57598, but he does not provide the purported paperwork from his folder or explain its absence.

Petitioner argues that the jury would have known that the alleged punch to the victim's eye could not have been serious because the same medical report was included in a misdemeanor that was dismissed for lack of evidence. As the trial evidence showed, however, the serious impairment

---

[5] During his testimony at sentencing, Petitioner asked the judge if he could show the jury where the complaining witness in his 2004 assault had stabbed him. The judge denied that request. (4 RR 69). Petitioner then testified that the 2004 assault case was "dropped as a misdemeanor".  The record shows that like the protective order case, it was a case was originally charged as a felony although Petitioner was convicted of a misdemeanor. (3 RR 129; 4 RR 70).

to the victim's eye did not manifest until several months after he alleges the misdemeanor was dropped. More importantly, the very same medical report was admitted before the jury, and counsel was able to point out the favorable information in it, such as the lack of nerve damage and the victim's 20/10 vision test. (3 RR 72-74). Petitioner's failure to obtain the cause number of the allegedly dropped misdemeanor therefore does not allege, much less prove, prejudice sufficient to undermine the verdict. Petitioner fails to show that the CCA's adjudication of this issue was unreasonable, and this claim should be denied.

**E.** _**Martinez** claim_

Petitioner next contends that under _Martinez,_ he was denied the effective assistance of counsel during the state habeas proceedings. (doc. 4 at 17.)

In _Martinez_, the Supreme Court held that, "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." _Martinez_, 132 S. Ct. at 1320. _Martinez_ does not provide a substantive claim for federal relief but only cause to excuse a procedural bar. _See Escamilla v. Stephens_, 749 F.3d 380, 395 (5th Cir. 2014) (holding that once a claim is considered and denied on the merits by the state habeas court, _Martinez_ is inapplicable).

Respondent has not alleged that any of Petitioner's ineffectiveness assistance claims in the original petition are procedurally defaulted. The claims were exhausted by Petitioner in state court and denied on the merits. Since no procedural bars have been asserted or applied to those claims, _Martinez_ is inapplicable. Even if it were, Petitioner has not shown that his ineffective assistance

claims have merit.  This claim should be denied. *See Preyor v. Stephens*, 537 Fed. Appx 412, 422

(5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014) (holding that the effectiveness of state habeas

counsel makes no difference to the outcome where the district court alternatively held that

ineffective claims against trial counsel were not substantial and lacked merit). Claim 3 should be

denied.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL (NEW GROUND)

In a motion for leave to amend his petition, which has now been granted, Petitioner asserted

a new claim that trial counsel was ineffective for failing to investigate and object at punishment to

the use of an invalid prior conviction to enhance his sentence.  (doc. 27.)  Respondent contends that

this new claim is untimely, procedurally barred from federal review, and without merit. (doc. 33.)

### A.  __Limitations__

As noted, AEDPA substantially changed the way federal courts handle habeas corpus

actions.  One of the major changes is a one-year statute of limitations.  *See* 28 U.S.C. § 2244(d)(1).

The one-year period is calculated from the latest of either (A) the date on which the judgment of

conviction became final; (B) the date on which an impediment to filing an application created by

State action in violation of the Constitution or laws of the United States is removed, if the applicant

was pre vented from filing by such State action; (C) the date on which the Supreme Court initially

recognizes a new constitutional right and makes the right retroactively applicable to cases on

collateral review; or (D) the date on which the facts supporting the claim became known or could

have become known through the exercise of due diligence.  *See id.* § 2244(d)(1)(A)-(D).

Here, Petitioner's conviction became final on October 23, 2012, when the time for filing a

petition for writ of certiorari with the Supreme Court expired. *See Roberts v. Cockrell*, 319 F.3d 690,

693–95 (5th Cir. 2003)(finality determined by expiration of time for filing further appeals); Sup. Ct. R. 13.1 (a petition for a writ of certiorari to review a judgment entered by a state court of last resort is timely when it is filed within 90 days after entry of the judgment). His first state application for writ of habeas corpus, filed on February 13, 2013,[6] and denied on May 29, 2013, tolled the limitations period for 105 days.[7] *See* 28 U.S.C. § 2244(d)(2) (West 2014). As a result, Petitioner's § 2254 petition was due by February 5, 2014.  Petitioner's original § 2254 petition, filed on July 29, 2013, was timely filed.  His motion to amend his federal petition, filed on November 13, 2014, was more than nine months too late. (doc.27 at 3.)

Under Rule 15(c)(2) of the Federal Rules of Civil Procedure, an amendment of a pleading relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Therefore, only those claims in the amended petition that are tied to a common core of operative facts as the claims in the original petition will relate back to the original petition and be considered timely filed. *See Mayle v. Felix*, 545 U.S. 644, 664 (2005).In order for Petitioner's newly proposed claim to relate back to the date he originally filed the § 2254 petition, there must be some commonality between it and the claims he initially raised.

Petitioner's new ineffective assistance of counsel claim in his motion to amend is separate and distinct from the ones asserted in his original § 2254 petition.  (*Compare* doc. 3 at 7-8 with doc.

---

[6] The date Petitioner signed the relevant state writ application has been used as the filing date. *See Richards v. Thaler*, 710 F.3d 573, 578–79 (5th Cir. 2013) (citing *Campbell v. State*, 320 S.W.3d 338, 339 (Tex. Crim. App. 2010) (prison mailbox rule applies to Texas post-conviction proceedings).

[7] As discussed below, Petitioner's second and third state writ applications do not toll the limitations period because they were filed after it expired.

27 at 1–3; 27-1 at 6.) The new claim does not supplement or amplify the facts already alleged, but attempts to introduce new legal theories on facts different from those underlying the original claims. *See, e.g., United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002) (although "an amendment offered for the purpose of adding to or amplifying the facts already alleged in support of a particular claim may relate back . . . one that attempts to introduce a new legal theory based on facts different from those underlying the timely claims may not") (citations omitted).

   "A prisoner should not be able to assert a claim otherwise barred by the statute of limitations merely because he asserted a separate claim within the limitations period." *United States v. Duffus*, 174 F.3d 333, 338 (3d Cir.1999).   "New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision." *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009). Petitioner's original claims involve an "entirely distinct type of attorney misfeasance" from his new claim. *Gonzalez*, 592 F.3d at 679 (quoting *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005)). His new claim presents "new ground[s] for relief supported by facts that differ in both time and type from those in the original pleading set forth." *Mayle*, 545 U.S. at 650.  As a result, it does not relate back to his original petition, and is time-barred under AEDPA in the absence of tolling.

   Additionally, Petitioner does not claim or set forth facts that the proposed new ground for relief meets one of the other grounds to start the limitations period under § 2244(d)(1)(B)-(D).  The new ineffective assistance claim does not concern a constitutional right recognized by the Supreme Court within the last year and made retroactive to cases on collateral review. In addition, the record does not reflect that any unconstitutional "State action" impeded Petitioner from raising this ground for relief before the end of the limitations period.   The factual predicate date does not save

Petitioner's new ineffective assistance of counsel claim because it relates to the punishment phase of his aggravated assault trial; it was discoverable through the exercise of due diligence by the time his conviction became final on October 23, 2012.

### 1.    *Statutory Tolling*

Section 2244 mandates that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending *shall not be counted toward any period of limitation under this subsection*." 28 U.S.C. § 2244(d)(2) (emphasis added).  Petitioner did not file his second state writ application raising his new ineffectiveness ground for relief until March 2014, and he did not file his third state writ application until August 2014, both after the one year limitations period had expired. While the one-year limitations period is tolled while a petitioner's state habeas application is pending before the Texas state courts, the federal one-year limitations period in this case expired before Petitioner filed his state writs. *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000)("state habeas application did not toll the limitation period under § 2244(d)(2) because it was not filed until after the period of limitation had expired"). The statutory tolling provision does not save Petitioner's amendment to this federal petition.

### 2.    *Equitable Tolling*

Nevertheless, the AEDPA's one-year statutory deadline is not a jurisdictional bar and can, in appropriate exceptional circumstances, be equitably tolled. *See Holland v. Florida*, 560 U.S. 631, 645-46 (2010); *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998); *cf. Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000) (only "rare and exceptional circumstances" warrant equitable tolling). "The doctrine of equitable tolling preserves a [party's] claims when strict application of the statute

of limitations would be inequitable." *Davis*, 158 F.3d at 810 (quoting *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995)). It "applies principally where [one party] is actively misled by the [other party] about the cause of action or is prevented in some extraordinary way from asserting his rights." *See Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (quoting *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)).   A habeas petitioner is entitled to equitable tolling only if he shows that: 1) he has been pursuing his rights diligently, and 2) some extraordinary circumstances prevented a timely filing.  *See Holland*, 560 U.S. at 649 (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  He bears the burden to show entitlement to equitable tolling. *Phillips v. Donnelly*, 223 F.3d 797, 797 (5th Cir. 2000) (per curiam).  Courts must examine each case in order to determine whether there are sufficient exceptional circumstances that warrant equitable tolling. *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999). The Fifth Circuit has also stated that when a prisoner contends that his ability to file a federal habeas petition has been affected by a state proceeding, the court should look at the facts to determine whether equitable tolling is warranted. *Coleman,* 184 F.3d at 402.

Here, Petitioner does not argue or show that he was prevented from filing this claim in his timely state writ application, or in his original § 2254 petition.  He has therefore failed to meet his burden to show that he is entitled to any tolling of the federal statute of limitations, and his new claim is time-barred.

**B.**    **Procedural Bar and Merit**

Petitioner acknowledges that the Texas Court of Criminal Appeals dismissed the ineffective assistance of counsel claim he attempts to add to this § 2254 petition pursuant to the Texas abuse of the writ doctrine codified at Texas Code of Criminal Procedure Article 11.07 § 4. (Doc. 27, at 2.)

Respondent asserts that Petitioner's new claim of ineffective assistance is procedurally barred from federal review.

Article 11.07 § 4 prohibits a claim from being raised in a subsequent habeas application unless: 1) it was not and could not have been raised in the previous application because the factual or legal basis was unavailable at the time; or 2) the claim contains sufficient facts establishing by a preponderance of the evidence that but for a violation of the United States Constitution, no rational juror would have found the petitioner guilty beyond a reasonable doubt.  *See* TEX. CODE CRIM. PROC. ANN. art 11.07 § 4(a) (Vernon 2007).

In general, federal courts may not review a state court decision that rests on an adequate and independent state procedural default unless the habeas petitioner can establish either "cause" for the default and "prejudice attributable thereto" or demonstrates that the failure to consider the federal claims will result in a "fundamental miscarriage of justice."  *Harris v. Reed*, 489 U.S. 255, 262 (1989).  To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds that bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995).  "[A]rticle 11.07 § 4 is an adequate and independent state procedural ground to bar federal habeas review and ... has been strictly and regularly applied since 1994."  *Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir.2000).  Because Petitioner has not shown cause or prejudice, this claim is also barred under the federal procedural default doctrine.

Because Petitioner asserted the exception to the procedural default bar recognized in *Martinez* as to his original ineffective assistance claims, his argument is also considered as to his

new ineffective assistance claim.  In *Trevino v. Thaler,* 133 S.Ct. 1911 (2013), the Court  applied

the holding of *Martinez* to a case arising from a § 2254 proceeding, and held  that a petitioner who

procedurally defaults a complaint of ineffective assistance of trial counsel "must show that (1) his

underlying claims of ineffective assistance of trial counsel are substantial, meaning that he must

demonstrate that the claim[s] ha[ve] some merit, and (2) his initial state habeas counsel was

ineffective in failing to present those claims in his first state habeas application." *Preyor,* 537 F.

App'x at 421 (citing *Martinez*, 132 S.Ct. at 1318; *Trevino*, 133 S.Ct. at 1921). In order to establish

ineffective assistance of his initial state habeas counsel, a petitioner must establish "both that habeas

counsel's performance—in failing to present the ineffective assistance of trial counsel claims in the

first state habeas application—was deficient and that he was prejudiced by the deficient

performance—that is, that there is a reasonable probability that he would have been granted state

habeas relief had the claims been presented in the first state habeas application." *Id.*

> Petitioner has failed to establish either of these elements to overcome his procedural default.

> The record reflects that because Petitioner pled not true to the two enhancement paragraphs alleged in the state indictment, this issue was fully developed at trial. The State presented the testimony of a fingerprint expert and placed the pen packets into evidence as support for the two enhancements. The defense objected to the pen packets, cross-examined the fingerprint expert, and argued that the State had failed to present sufficient evidence to prove that Petitioner had been convicted of the two offenses alleged in the enhancement paragraphs. The jury found the two enhancement paragraphs to be true beyond a reasonable doubt. (R.4:5–44, 80–83, 90). Petitioner has not demonstrated good cause for failing to raise a claim regarding the enhancement paragraphs earlier. (doc. 22, at 2–3.)

Petitioner's new proposed claim of ineffective assistance is without merit because counsel actually

did raise objections to the use of  prior conviction to enhance.  It should be denied.

## VI.  SUPPRESSION OF EVIDENCE (GROUND 4)

In his fourth ground, Petitioner asserts that the prosecutor violated *Brady v. Maryland*, 373

U.S. 83 (1963), by suppressing the fact that the June 5, 2009 medical report admitted at trial was the very same medical report used in a dropped misdemeanor case filed under cause number MA09-57598.  He also claims that the prosecution suppressed the police report.

In *Brady*, the Supreme Court held that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to his guilt or punishment. *Brady*, 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material within the meaning of *Brady* only when there is a reasonable probability of a different result at trial had the evidence been disclosed. *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995). A "reasonable probability" of a different result is shown when the prosecution's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Petitioner appears to complain that the prosecution suppressed information regarding the police report and the use of the June 5 medical records (SX 4) in the initial filing of the case as a misdemeanor.  His misdemeanor charge and its dismissal, if one exists, is a public record to which Petitioner had access. "Brady claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'" *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994). The prosecution "is not obligated to furnish information that is fully available to the defendant or that could be obtained through reasonable diligence." *See May v. Collins*, 904 F.2d 228, 231 (5th Cir. 1990). In fact, Petitioner asserted in ground three that he possessed this

information in a folder he had at trial.  There is no suppression under the facts of this case. *See West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (stating that evidence is not "suppressed" if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence) (quoting *Lawrence*).

Petitioner also fails to show the state court's ruling on materiality was unreasonable. The emergency room records from June 5 were admitted at Petitioner's trial; he does not contend they are incomplete.  Defense counsel was able to point out their deficiencies, and the jurors were able to assess their full evidentiary value. Petitioner does not show how the alleged dismissal and the accompanying police report for the misdemeanor would be material in this felony prosecution. The serious bodily injury allegations were supported by the records of Cornea Associates, which documented the infection and scarring months after the police report and dismissal were allegedly generated.  As such, the state habeas court's denial of relief was not an unreasonable application of federal law, and this claim should be denied.

## VII.  ASSISTANCE OF APPELLATE COUNSEL (GROUND 5)

In ground five, Petitioner contends his counsel on appeal was ineffective for failing to (1) raise an ineffective-assistance claim against trial counsel for failing to object when the trial court would not let him retrieve documents during his testimony, (2) raise an ineffective assistance claim against trial counsel for failing to argue that the State did not prove the serious bodily injury or deadly weapon allegations, (3) bring up his prior dealings with the prosecutor in the protective order case to show prosecutorial vindictiveness, and (4) provide him copies of the trial record so that he could assist in the appeal and file further actions.

*Strickland* applies to allegations of ineffective assistance of appellate counsel. *See Dorsey*

*v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). Appellate counsel need not raise every non-frivolous issue on appeal to be effective. *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). "Instead, to be deficient, the decision not to raise an issue must fall below an objective standard of reasonableness.'" *Phillips*, 210 F.3d at 348 (quoting *Strickland,* 466 U.S. at 688). When counsel files a merits brief, a defendant generally must show that "a particular nonfrivolous issue was clearly stronger than issues counsel did present." *Dorsey*, 720 F.3d at 320. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Id.* Prejudice in the context of appellate counsel error requires the Petitioner to demonstrate a reasonable probability that he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Appellate counsel raised two related claims. She argued that the evidence was legally insufficient to prove Petitioner's hands were deadly weapons because it did not establish that the victim suffered serious bodily injury or that Petitioner intended serious bodily injury. She also argued that the trial court erroneously overruled trial counsel's request for a jury instruction on the lesser-included offense of simple assault without a deadly weapon. Counsel argued that these errors together entitled Petitioner to a judgment of acquittal. The state habeas court could have reasonably concluded that appellate counsel's decision to raise these claims and not others did not amount to constitutionally deficient performance or did not prejudice Petitioner's appeal.

## A.     Ineffective assistance claims

Petitioner contends that appellate counsel should have raised an ineffective assistance claim against trial counsel for failing to object when the trial judge did not let him obtain the cause number of the allegedly dropped misdemeanor charge. He claims that if the jury had known the medical

report was the basis of a misdemeanor charge that had been dropped, the jury would have known the "faked seriousness" of the evidence. (doc. 4 at 22.)  As discussed, the medical report was in evidence. Defense counsel explored the portions that were helpful to the defense, such as the 20/10 vision test and the absence of a diagnosis of "nerve damage." (3 RR 71-74). Petitioner does not say what more trial counsel could have done had Petitioner been allowed to obtain the cause number.

Petitioner also contends that appellate counsel should have raised an ineffective-assistance claim against trial counsel for failing to argue that the State did not prove the serious bodily injury or deadly weapon allegations.  Trial counsel did make these arguments. He argued that the victim did not suffer serious bodily injury, "no way, no how." (3 RR 180). He emphasized her "remarkable" 20/10 vision on the night of the assault, pointed out that the medical records simply recorded what the victim told the medical personnel, and argued that the State did not call a doctor to testify. (3 RR 181-82).  He also argued that there was no direct evidence that Petitioner's hands were deadly weapons, that the defense rebutted the victim's testimony that Petitioner was a boxer, and that there was no evidence from which to infer that Petitioner intended to cause death or serious bodily injury. (3 RR 182-83). Petitioner fails to acknowledge these arguments made by trial counsel. He fails to demonstrate that it was necessarily unreasonable for the state court to reject his ineffective assistance of appellate counsel claim based on her failure to challenge trial counsel's representation.

**B.      Prosecutorial vindictiveness claim**

Petitioner asserts appellate counsel should have brought up his prior dealings with the prosecutor in the protective order case to show prosecutorial vindictiveness. As discussed, Petitioner was arrested for this assault on June 5, the victim obtained a protective order based on this assault on June 6, and Petitioner was released on June 11. On June 14, he was re-arrested for violating that

protective order by assault, a felony. He remained in custody until his trial in the protective order case one year later. He was convicted of a misdemeanor offense and was about to be released on probation, when a magistrate issued an arrest warrant for the original June 5 assault. Petitioner had to remain in custody until his trial in the assault case took place seven months later.

The aggravated assault is a separate offense that occurred on a different day, prior to the protective order violation. The trial evidence shows the victim's eye did not manifest serious bodily injury until several months after the June 5 assault, (5 RR 34), which provides a reasonable explanation for the prosecutor's delay in filing the felony charge. While it appears that the filing of the charge was timed to prevent Petitioner's release from custody, that strategic timing in the filing of valid criminal charges alone does not equate to prosecutorial vindictiveness. *Cf.* Bordenkircher, 434 U.S. at 364 (holding that a prosecutor's conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an arbitrary classification such as race or religion) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Petitioner failed to demonstrate that it was necessarily unreasonable for the state court to reject his ineffective assistance of appellate counsel claim based on her failure to raise prosecutorial vindictiveness.

## C.   **Appellate transcript**

Finally, Petitioner contends appellate counsel failed to provide him a copy of his trial transcript, which would have allowed him to point out the things he told her about trial, and that this failure left him ill-equipped to take further action in his case. Petitioner provides no authority for his assertion that appellate counsel who file a merits brief must also provided the client a copy of the record. *See Kelly v. State*, 436 S.W.3d 313, 316 n.7 (Tex. Crim. App. 2014) (discussing the non-

constitutional obligation to provide indigent inmates access to the record when appointed counsel files an *Anders* brief). Petitioner's claims are conclusory. *See Trottie v. Stephens*, 720 F.3d 231, 255 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1540 (2014) (affirming district court's rejection of due process claim where Petitioner offers "no more than speculation" that trial error occurred).

Petitioner has failed to demonstrate that the state court's rejection of his claims against appellate counsel was necessarily unreasonable, and claim five should be denied.

## VIII.  REQUEST FOR HEARING

Petitioner requests a hearing or a remand back to state court for a hearing. (doc. 4 at 11, 17-18, 25.)  He claims that the convicting court entered an order designating controverted, previously unresolved factual issues material to the legality of his confinement (ODI) on April 7, 2013, that was not addressed by the CCA when it denied relief without a written order.  The ODI appointed a special master to resolve the prosecutorial vindictiveness issue and the two ineffective assistance claims and to prepare findings and conclusions. (doc. 4 at 26-27. ) The ODI is not contained in the state habeas records that were filed by respondent with the Court. (*See* docs. 13, 14, 15.)

The statutory time period for the convicting court to issue an ODI apparently expired without one being issued.  Under Texas law, this constitutes a finding that there are no such issues, and the clerk is required to immediately transmit the case to the CCA. *See* Tex. Code Crim. Proc. Ann. art. § 11.07, § 3(c). Here, the clerk transmitted Petitioner's writ application and the record to the CCA on March 29, 2013, one day after the statutory period expired, and nine days before the ODI proffered by Petitioner was signed. (5 SHR 3).

Petitioner notified the CCA of the belated ODI and filed an "Objection to District Court's Procedural Error," (1 SHR), a letter transmitting a re-typed copy of the purported ODI (2 SHR); a

Request for Findings of Fact and Conclusions of Law (3 SHR); and an objection to the denial of a

evidentiary hearing (4 SHR). It does not appear that the CCA ruled on these filings, but Texas case

law provides that an untimely ODI interferes with the clerk's duty to transmit the application to the

CCA and is without effect. *See Gibson v. Dallas Co. Dist. Clerk*, 275 S.W.3d 491, 492 (Tex. Crim.

App. 2009).

A federal habeas court has discretion to grant an evidentiary hearing if one is not barred

under § 2254(e)(2). *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). In exercising that discretion,

a court considers whether a hearing could enable Petitioner to prove factual allegations which, if

true, would entitle him to relief. *Landrigan*, 550 U.S. at 474. It must also consider the deferential

standards in § 2254(d), which limit its ability to grant habeas relief. *Id*. In practical effect, if the state

court record precludes habeas relief under § 2254(d), a district court is not required to hold an

evidentiary hearing. *Id*.; *Pinholster*, 131 S. Ct. at 1399.

As noted above, Petitioner's allegations related to claims 2 (prosecutorial vindictiveness),

3 (ineffective assistance of trial counsel), and 5 (ineffective assistance of appellate counsel) are not

supported by the record, and the state court's rejection of the claims was not unreasonable under §

2254(d). Even if taken as true, Petitioner's alleged facts would still not entitle him to relief, and his

request for a hearing should be denied.

To the extent Petitioner also complains that the belated ODI denied him due process of law,

he provides no authority for that assertion. (Mem. at (4)-D, (5)-D). On the contrary, a "full and fair

hearing" is not a precondition to according a presumption of correctness to state court findings of

fact nor to the AEDPA's deferential standards of review. *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th

Cir. 2001). Such procedural irregularities, if the untimely ODI can be categorized as such, do not

in themselves provide an avenue for federal habeas relief. *See Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (holding that alleged infirmities in state habeas proceedings cannot be grounds for federal habeas relief). Insofar as the CCA ultimately adjudicated his claims on the merits, the AEDPA bars federal habeas relief absent a determination, based on only the evidence before the state court, that the state court adjudication was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. *See* § 2254(d); *Knighten v. Stephens*, No. 3:13-CV-2442-P, 2014 WL 696519, at *4 (N.D. Tex. Feb. 24, 2014) (Solis, J.) (adopting magistrate's rejection of challenge to CCA's premature denial of writ without benefit of convicting court's ODI and findings).

## IX.  RECOMMENDATION

The petition for habeas corpus relief should be **DENIED** with prejudice.

**SO RECOMMENDED on this 12th day of May, 2015.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

38